IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERELY PELLEGRINO, | ) | Case No. 5:18-cv-2644 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Kimberely Pellegrino, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in evaluating a treating-source opinion, I recommend that the Commissioner's final decision denying Pellegrino's application for DIB be VACATED and that Pellegrino's case be REMANDED for further consideration.

## II.    Procedural History

On November 12, 2014, Pellegrino applied for DIB.  (Tr. 15, 218-19).[1]  Pellegrino alleged that she became disabled on October 5, 2012, due to "anxiety panic disorder, depression, acromi[o]clavicular ac joint arthritis, [COPD] asthma, unindifferential connective tissue disease,

---

[1] The administrative transcript is in ECF Doc. 9.

[Behçet's disease], L4 L5 S1 lamenectomy [*sic*], degenerative disc disease, radiculop[athy], 2 shoulder surgeries, Labral tears, bicep tenectinotomys [*sic*], alcoholism, heroin addiction [requiring] hosp[italitation] 5 times, Polycystic Ovarian Syndrome [("PCOS")], [o]besity, type 2 pre diabetic, [Hidradenitis] Suppraiva[, and] folliculitis."  (Tr. 106, 218).  The Social Security Administration denied Pellegrino's application initially and upon reconsideration.  (Tr. 106-36). Pellegrino requested an administrative hearing.  (Tr. 149-50).  ALJ Scott Canfield heard Pellegrino's case on February 9, 2017, and denied the claim in a May 2, 2018, decision.  (Tr. 12-105).  On October 24, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-9).  On November 15, 2018, Pellegrino filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.    Evidence

### A.    Personal, Educational and Vocational Evidence

Pellegrino was born on July 27, 1970, and she was 42 years old on the alleged onset date. (Tr. 35).  Pellegrino was considered a "younger individual" because she was under 49 years old. (Tr. 35).  Pellegrino graduated from high school and had prior work experience as a vocational training instructor, manager of a beauty salon, nail technician, principal, and medical records technician.  (Tr. 34-35).

### B.    Relevant Medical Evidence

In 2003, Pellegrino had a laminectomy of her L4-L5 vertebrae; in 2007 she had a lipoma surgery on her left upper back; and in 2010 she had a cholecystectomy to remove her gallbladder.  (Tr. 340, 416).

On November 11, 2010, Kevin Hopkins, M.D., noted that Pellegrino had pain in both her hips and painful, tender varicose veins in both of her legs.  (Tr. 607).  Nevertheless, Dr. Hopkins noted that Pellegrino had "no gait abnormalities."  (Tr. 608).

2

On February 3, 2012, I-Yuan Chang, M.D., took an MRI of Pellegrino's shoulder. (Tr. 716).  Dr. Chang found that there were mechanical stress changes in Pellegrino's shoulder joint, but there was no rotator cuff tear.  (Tr. 716).

On May 29, 2012, Pellegrino saw Vernon Patterson, D.O., for treatment of her shoulder pain. (Tr. 530).  Dr. Patterson noted that an MRI showed significant degenerative joint disease in her shoulder joints.  (Tr. 530-31).  Dr. Patterson referred Pellegrino to physical therapy, prescribed her pain mediation, and recommended that she ice her shoulder three times per day. (Tr. 531).

On June 6, 2012, Pellegrino saw Tamara Murray, P.T., for physical therapy.  (Tr. 527). Pellegrino told Murray that her pain was getting worse and that she had decreased ability to reach across her body.  (Tr. 527).  Pellegrino also rated her pain as a 4/10 and said that she was not taking her prescribed trazadone or proloxicam because they were too expensive.  (Tr. 527). Murray noted that Pellegrino had a limited gait.  (Tr. 528).

On October 5, 2012, Pellegrino saw Kim Stearns, M.D., for arthroscopic surgery after "conservative treatment" and injections failed to help her right-shoulder pain.  (Tr. 507-09, 1156-57).  During the procedure, Dr. Stearns found that Pellegrino had a displaced bucket-handle tear in her labrum (shoulder cartilage) and a high-grade tear of her bicep tendon.  (Tr. 508, 1156). She also had an inflamed subacromial bursa, without spurring.  (Tr. 508, 1156).  Dr. Stearns flushed and irrigated Pellegrino's shoulder joint space.  (Tr. 508, 1157).  Dr. Stearns referred Pellegrino to physical therapy.  (Tr. 505).  At follow-ups in November and December 2012, Dr. Stearns noted that Pellegrino was "making great progress" on improving her motion, strength and pain; however, she continued to have "stabbing, throbbing, burning, aching, radiating, and penetrating" pain in her neck, shoulder, arms, back, and legs throughout the day and night. (Tr. 1107, 1111-12).  On January 10, 2013, Dr. Stearns noted that Pellegrino was "definitely

getting better," even though she had not been able to attend therapy due to taking care of her father.  (Tr. 1117).  On February 13, 2013, Dr. Stearns noted that Pellegrino had "much less pain and better range of motion."  (Tr. 468, 1121).  Dr. Stearns told Pellegrino that she could return to work "anytime," but she should start slow and ease back into her regular routine.  (Tr. 468, 1121).  On March 25, 2013, Dr. Stearns noted that Pellegrino was sore, but she managed to return to work and exercised on her own.  (Tr. 1124).  On June 3, 2013, Dr. Stearns noted that Pellegrino was back at work, continued to have shoulder pain, but had good strength and range of motion.  (Tr. 1129).  Dr. Stearns noted that cutting hair was not conducive to her chronic issues and recommended that Pellegrino consider a vocational rehabilitation program.  (Tr. 1129).  On August 2, 2013, Dr. Steans did not note any significant changes in Pellegrino's condition.  (Tr. 444).

On October 12, 2012, Pellegrino saw Huber Suskiewicz, P.T., for a physical therapy session to recover from her shoulder surgery.  (Tr. 505).  Pellegrino told Suskiewicz that she iced her shoulder to help the pain, and that she was compliant with her shoulder sling.  (Tr. 505).  She rated her pain as a 7/10 and said that it ached intermittently.  (Tr. 505).  She said that her shoulder pain caused extreme interference with her normal social activities and prevented her from sleeping.  (Tr. 505).  Suskiewicz noted that Pellegrino was diagnosed with chronic back pain in 2009, which she managed with ibuprofen and Robaxin.  (Tr. 505).  Suskiewicz also noted that Pellegrino had decreased range of motion and strength in her right shoulder, but her other functions – including her gait – were normal.  (Tr. 506).  On October 23 and 26, 2012, Suskiewicz noted that Pellegrino's pain continued, but she was making progress with therapy.  (Tr. 501-02).  On November 3, 2012, Pellegrino said that her shoulder felt "very stiff" and she rated her pain as a 6/10.  (Tr. 496).  On November 13, 2012, Pellegrino told Suskiewicz that she had increased shoulder pain and swelling and that she had raked leaves the preceding weekend.

4

(Tr. 490).  On December 28, 2012, Suskiewicz noted that Pellegrino had missed a lot of physical therapy appointments because she was "busy," and that Pellegrino said she had intermittent pain. (Tr. 479).  Suskiewicz noted that Pellegrino had increased endurance/activity tolerance, increased independence with her home exercise plan, and decreased intensity and frequency of pain.  (Tr. 480).

On April 3, 2013, Pellegrino told Dr. Hopkins that she had intermittent shoulder and forearm pain.  (Tr. 460).  On examination, Dr. Hopkins noted that Pellegrino had normal range of motion, despite her pain.  (Tr. 460).  Dr. Hopkins prescribed naproxen.  (Tr. 460).  August 5, 2013, Pellegrino told Dr. Hopkins that she had left shoulder pain that had gotten worse over the preceding three months.  (Tr. 443).  She asked Dr. Hopkins about getting an injection, and said that ice, heat, NSAIDS, and acetaminophen had not helped her.  (Tr. 443).  She said that she used Vicodin and ibuprofen.  (Tr. 443).  Dr. Hopkins noted that Pellegrino had some limited range of motion, refilled her pain medications, and gave her a steroid injection.  (Tr. 443).  On August 21, 2013, Pellegrino told Dr. Hopkins that she had lower leg pain and swelling, which got worse with walking.  (Tr. 441, 934).  She said that she had tried heat, ice, ibuprofen, Vicodin, elevation, and rest without relief.  (Tr. 441, 934).  On examination, Dr. Hopkins noted that Pellegrino's legs were tender, but she had normal pulses and strength.  (Tr. 441, 934).

On June 10, 2013, an x-ray showed a "tiny bone island or small anterior spur" in Pellegrino's left elbow, but her arm and shoulder were otherwise normal.  (Tr. 453).

On October 1, 2013, Dr. Stearns noted that Pellegrino's left shoulder had begun to bother her and that her injection gave her no relief.  (Tr. 438).  Dr. Stearns scheduled Pellegrino for a left shoulder MRI.  (Tr. 438).   On November 13, 2013, Dr. Stearns noted that Pellegrino had SLAP tear, mild arthritis, and AC arthropathy with edema in her left shoulder.  (Tr. 433, 952, 1132).  Dr. Stearns recommended an arthroscopic debridement surgery with a bicep tenotomy

because conservative treatment had failed.  (Tr. 433, 1132).  On April 1, 2014, Dr. Stearns noted

that Pellegrino's shoulder was getting worse, and that had limited range of motion with pain.

(Tr. 423).  Pellegrino told Dr. Stearns that she was completing a pharmacy tech program and that

she wanted to do the recommended surgery in June.  (Tr. 423).  On April 21, 2015, Pellegrino

told Dr. Stearns that returning to work part-time had exacerbated her pain.  (Tr. 343).  Dr.

Stearns said that, although she did not believe Pellegrino was disabled, she was unable to return

to her work as a hair stylist due to her shoulder pain.  (Tr. 343).  Dr. Stearns recommended that

Pellegrino get a shoulder injection.  (Tr. 343).

On May 7, 2014, Pellegrino told Dr. Hopkins that she had leg numbness, walked with a

slight limp, and wanted forms filled out so she could qualify for Medicaid.  (Tr. 420).  On

examination, Dr. Hopkins did not note any significant abnormalities, other than mild bilateral

expiratory wheezing.  (Tr. 420).  On May 21, 2014, Pellegrino told Dr. Hopkins that she had

chronic pain in her left shoulder, which she rated as a 6/10 to 7/10.  (Tr. 1157).  On examination,

Dr. Hopkins noted that Pellegrino had no edema in her extremities, grossly intact muscle strength

in her right upper extremity and lower extremities, and no muscle atrophy.  (Tr. 1160).

Pellegrino had reduced range of motion in her left upper extremity.  (Tr. 1160).  She also had

some tenderness in her lower back, but her neck and upper back were normal.  (Tr. 1160).  On

September 14, 2015, Pellegrino saw Dr. Hopkins to fill out disability forms, and she said that she

wanted her chronic pain listed as her main diagnosis and that "her limping, gait, and severe pain

inability to walk [kept] her from working."  (Tr. 1222).  Pellegrino said that she went to pain

management, was about to start aquatic therapy, and used a TENS unit.  (Tr. 1222).  She

declined Lyrica from her podiatrist, asked her podiatrist for Topamax, and had to discontinue

previous prescriptions for gabapentin, baclofen, and Topamax due to adverse side effects.  (Tr.

1222).  On examination, Dr. Hopkins noted that Pellegrino had mild diffuse expiratory

6

wheezing; no cyanosis, clubbing, or edema in her extremities; and previous diagnoses of asthma, wheezing, chronic neck pain, anxiety, leukocytosis, lumbosacral radiculopathy, shoulder/arm sprains, capsulitis in her left foot, and metatarsalgia in her left foot. (Tr. 1223-24). Dr. Hopkins declined to prescribe any pain medications because she was seeing "multiple specialists" for her pain issues, including a pain management physician and a podiatrist. (Tr. 1224). On October 18, 2016, Dr. Hopkins noted that Pellegrino's rheumatologist had diagnosed her with Behçet's disease[2], fibromyalgia, and connective tissue disease; she had difficulty walking and used a cane for a while; and she had pain all the time. (Tr. 1349). Dr. Hopkins did not note any abnormalities on examination, and he recommended that Pellegrino maintain a healthy diet and get 20-30 minutes of aerobic exercise 3-4 times per week. (Tr. 1350-51). On November 24, 2014, Pellegrino told Dr. Hopkins that she had pain and swelling "all over her body" and "trouble walking." (Tr. 354). She said that her legs went numb sometimes when she was standing, she could not feel her legs at those times, and she had difficulty balancing. (Tr. 354). On examination, Dr. Hopkins noted that Pellegrino's upper and lower extremities were normal, except for limited range of motion due to pain. (Tr. 355).

On May 15, 2014, Pellegrino saw endocrinologist Seenia Peechakara, M.D., for treatment related to her PCOS. (Tr. 415-18). On examination, Dr. Peechakara noted that Pellegrino was alert, had no deformities or edema in her extremities, and had normal range of motion, muscular strength, gait, and reflexes. (Tr. 417). Dr. Peechakara recommended that Pellegrino use a protein-sparing modified fast ("PSMF") diet to control her metabolism and prediabetes. (Tr. 418). At a follow-up on June 17, 2015, Dr. Peechakara did not note any significant changes in Pellegrino's condition or recommend treatment. (Tr. 1018). On September 28, 2015,

---

[2] This record implies that Pellegrino told Dr. Hopkins that her rheumatologist had made the Behçet's disease diagnosis because nothing in the record indicates direct communication between Dr. Hopkins and Dr. Ignat, the rheumatologist.

Dr. Peechakara noted that Pellegrino was alert, had clear lungs, and had normal range of motion, strength, gait, reflexes, and sensation.  (Tr. 1233).  Dr. Peechakara noted that Pellegrino had done well on her PSMF diet and did not need any new medications.  (Tr. 1233).  On November 4, 2016, Dr. Peechakara did not note any significant changes in Pellegrino's condition.  (Tr. 1360-63).

On May 30, 2014, Dr. Stearns performed the left-shoulder surgery that she had recommended in November 2013.  (Tr. 404-07).  At follow-ups on June 12, July 10, and August 7, 2014, Dr. Stearns noted that Pellegrino was "doing very well" and that by August she had regained full motion and was able to exercise on her own.  (Tr. 394-95, 1136, 1138, 1142).  On September 18, 2014, Dr. Stearns noted that Pellegrino "ha[d] not been very diligent about going to therapy [due to] personal issues," but her motion and strength in her shoulders was "quite good."  (Tr. 764).  Dr. Stearns noted, however, that Pellegrino had "chronic pain all over her body;" indicated there was nothing more she could do for her; and stated that she would benefit from pain management.  (Tr. 764).  Dr. Stearns also recommended that Pellegrino complete her vocational rehabilitation courses.  (Tr. 764).  On November 6, 2014, Dr. Stearns wrote a letter indicating that Pellegrino could return to her job as a hair dresser for up to 6 hours per day, 5 days per week.  (Tr. 994).  At a follow-up on December 5, 2014, Dr. Stearns noted that Pellegrino was discharged from her vocational rehabilitation program because she missed her appointment due to "alleged pneumonia."  (Tr. 353, 763, 766).  Dr. Stearns noted that Pellegrino had painful range of motion, constant pain, tender shoulder joints, poor flexion, and drop weakness; however, Pellegrino had no instability and was neurologically intact.  (Tr. 353, 763, 766).  Dr. Stearns ordered an additional MRI, which showed acromioclavicular joint degenerative arthritis but no other significant abnormality. (Tr. 353, 763, 766, 959-60).

8

Between June 20, 2014, and August 29, 2014, Pellegrino attended 12 physical therapy sessions.  (Tr. 350, 375-403).  At her initial evaluation, Pellegrino said that she had intermittent shoulder pain, which she rated her between a 4/10 and 8/10.  (Tr. 401).  Pellegrino's pain ranged between 1/10 and 3/10 between June 30, 2014, and July 23, 2014.  (Tr. 389-98).  On July 25, 2014, Pellegrino said that she had 10/10 pain at night and 7/10 pain constantly.  (Tr. 385).  Throughout her treatment, Lynsey Baron, P.T., and Brian Warner, A.T., regularly noted that Pellegrino did well and improved her range of motion after treatment.  (Tr. 375-403).  On February 4, 2015, Pellegrino was discharged from physical therapy because she had not returned or made any follow-up appointments.  (Tr. 350-51).  On December 11, 2014, an MRI of Pellegrino's shoulder showed that she had no joint effusion or synovitis, and her cartilage was within normal limits.  (Tr. 760).  The MRI also showed "posterior subluxation of the humeral head," "postsurgical changes of biceps tenotomy," and "acromioclavicular joint degenerative arthritis."  (Tr. 760).

On December 12, 2014, Pellegrino saw William Bohl, M.D., for an examination of her left shoulder.  (Tr. 762).  Pellegrino told Dr. Bohl that she continued to have pain in her left shoulder, despite having had surgery; however, surgery had resolved the pain in her right shoulder.  (Tr. 762).  Pellegrino also said that injections did not help.  (Tr. 762).  On examination, Dr. Bohl noted that Pellegrino had full passive range of motion, but abduction and overhead motion was particularly painful.  (Tr. 762).  He noted that x-rays and MRIs had shown arthritis, cyst formation, and spurs in her shoulder joint.  (Tr. 762).  Dr. Bohl recommended injections and, if those failed to work, a Mumford procedure (surgery).  (Tr. 762).  At a follow-up on June 15, 2015, Dr. Bohl noted that Pellegrino said her anti-inflammatory medication did not adequately control her arthritis.  (Tr. 950).  On examination, Dr. Bohl noted

9

that Pellegrino's shoulder was tender, but she had full range of motion, no crepitus, and "reasonably good rotator strength." (Tr. 950). Dr. Bohl gave her another injection. (Tr. 950).

On March 5, 2015, Pellegrino first saw Gheorghe Ignat, M.D., for a rheumatological evaluation. (Tr. 1080-81). Pellegrino told Dr. Ignat that she had intermittent leg numbness and pain. (Tr. 1080). On examination, Dr. Ignat noted that Pellegrino had normal cardiopulmonary function, normal neurological functions, full strength in her shoulders and hips, normal grips, no acute symptoms in her ankles or knees, and no acute symptoms in her arms. (Tr. 1080). Dr. Ignat noted that Pellegrino had decreased range of motion in both shoulders, positive straight leg raising sign, and pain and tenderness in her spine. (Tr. 1080). Dr. Ignat noted that "undifferentiated corrective tissue disease, Sjogren's, SLE, [and] Behçet's disease [were] all possible"; however, Pellegrino "[did] not have enough criteria for Behçet's." (Tr. 1080); *see also* (Tr. 1086, 1091) (lab test results). Dr. Ignat determined that Pellegrino had chronic pain syndrome, right leg lumbar radiculopathy, and chronic low back pain, and he prescribed colchicine (an anti-inflammatory medication). (Tr. 1080). At follow-ups in May through December 2015, Pellegrino reported that her colchicine helped her symptoms. (Tr. 1077). On July 29, 2015, Dr. Ignat added Topamax for foot pain, and on September 30, 2015, he added tizanidine (a muscle relaxant). (Tr. 1075-76). On October 14, 2015, Pellegrino said that her foot felt better with new shoes, and on November 11, 2015, she said that her tizanidine helped her pain. (Tr. 1073-74). On January 8, 2016, Dr. Ignat noted that Pellegrino reported problems with balance and said that she could not walk without a walker and that she was being treated by a podiatrist and a pain management specialist. (Tr. 1071). On February 18, 2016, Pellegrino told Dr. Ignat that her Tramadol prescription made her feel high, her tizanidine did not help, and she felt worse overall. (Tr. 1103, 1314). Dr. Ignat noted that Pellegrino's neurologist had recommended physical therapy and that she said gabapentin and Lyrica did not help her in the

10

past. (Tr. 1314).  Dr. Ignat did not note any significant changes in Pellegrino's condition in March and June 2016, but he added prescriptions for Tylenol and methotrexate (an immunosuppressive/chemotherapy medication).  (Tr. 1163-65, 1301-02, 1313, 1461-62).  On July 14, October 6, and November 3, 2016, Pellegrino told Dr. Ignat that she had less pain after starting methotrexate.  (Tr. 1295-99, 1455-59).  In October 2016, Dr. Ignat added metoclopramide to alleviate some side effects that Pellegrino reported from her methotrexate.  (Tr. 1297, 1459).  At follow-ups in May through September 2017, Dr. Ignat did not note any significant changes in Pellegrino's condition, but he stated that Pellegrino had "a mild form of [Behçet's disease]."  (Tr. 1502-10).  On November 7, 2017, Pellegrino said that she was stable with less pain, and she felt less depressed.  (Tr. 1500).  On February 20, 2018, Dr. Ignat noted that Pellegrino had bursitis of her right hip, and he recommended exercises and a steroid injection.  (Tr. 1492).

On April 4, 2015, Pellegrino had podiatrist Jeffrey Halpert, D.P.M., treat an ingrown toenail. (Tr. 1035).  Dr. Halpert noted that Pellegrino was alert and oriented, and that she denied calf pain when walking.  (Tr. 1037).  He noted that Pellegrino had full muscle strength and full range of motion in her feet and ankles.  (Tr. 1037).  At a follow-up on April 11, 2015, Dr. Halpert noted that Pellegrino had "some discomfort," but he did not note any specific abnormalities.  (Tr. 1041).  On August 8, 2015, Pellegrino told Dr. Halpert that she had continued to have extreme foot pain and that previous prescriptions for Neurontin, baclofen, prednisone, and Topamax had not helped.  (Tr. 1045).  Dr. Halpert noted that an MRI had shown capsulitis in her foot joints and interspace perineural fibrosis consistent with neuroma, and that Pellegrino had been diagnosed with diabetes.  (Tr. 1045).  On examination, Dr. Halpert found that Pellegrino had full muscle strength and range of motion in her feet and ankles; however, she had a slightly contracted toe on her left foot.  (Tr. 1047). An x-ray showed medial position of her

second toe, open joint spaces, no fractures, and an inferior calcaneal spur.  (Tr. 1047).

Dr. Halpert splinted Pellegrino's toe, prescribed an ambulatory surgical boot and custom

orthotics, and recommended that Pellegrino wear "good quality tennis shoes."  (Tr. 1047-48).

On August 26, 2015, Pellegrino said that she continued having "significant discomfort" in her

foot.  (Tr. 1052).  At a follow-up on October 1, 2015, Dr. Halpert did not note any changes in

Pellegrino's condition.  (Tr. 1058-60).  Dr. Halpert casted Pellegrino's foot for custom orthotics

and continued his recommendation that she wear "good quality tennis shoes."  (Tr. 1061).

Dr. Halpert also noted that Pellegrino was prescribed aquatic therapy and given a TENS unit, but

her pain management doctor did not recommend narcotics because she had said Percocet did not

help, and she had nonmalignant pain syndrome of unclear etiology.  (Tr. 1063).

On May 29, 2015, Howard Potash, M.D., took an MRI of Pellegrino's spine and brain.

(Tr. 1001-05).  He found that Pellegrino had normal disc bulges or protrusions and normal disc

height and size and that she had no fractures and no cord compression.  (Tr. 1001).  Overall,

Pellegrino's spine and brain were normal.  (Tr. 1003, 1005).

Between June 1, 2015, and October 14, 2016, Pellegrino saw Jo Toomey, L.S.W., for 36

counseling sessions.  (Tr. 1375-1410).  On January 9, 2017, Toomey completed a medical source

statement form evaluating Pellegrino's mental capacity.  (Tr. 1372-74).  Toomey indicated that

Pellegrino could frequently: (1) follow work rules; (2) use judgment; (3) respond appropriately

to changes in routine settings; (4) deal with the public; (5) relate to coworkers; (6) interact with

supervisors; (7) understand, remember, and carry out detailed, but not complex, job instructions;

(8) understand, remember, and carry out simple job instructions; (9) maintain her appearance;

(10) socialize; (11) manage funds/schedules; and (12) leave home on her own.  (Tr. 1372-73).

She could only occasionally: (1) maintain attention and concentration for extended periods of

2-hour segments; (2) maintain regular attendance and be punctual within customary tolerance;

(3) function independently without redirection; (4) work in coordination or proximity to others without being distracted; (5) work in coordination or proximity to others without being distracting; (6) deal with work stress; (7) complete a normal workday and workweek without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (8) understand, remember, and carry out complex job instructions; (9) behave in an emotionally stable manner; and (10) relate predictably in social situations.  (Tr. 1373-74).  In September 2015, Toomey had said that Pellegrino was able to perform all of the foregoing mental functions constantly or frequently.  (Tr. 757-58).

On June 2, 2015, Toomey and psychologist G. Fritz Klemperer, Ph.D., completed a daily activities questionnaire and mental capacity evaluation form.  (Tr. 943-947).  Dr. Klemperer noted that Pellegrino did not have any problems until her physical issues interfered with her work and that she developed fatigue, depression, anxiety, and chronic pain.  (Tr. 943).  He noted that Pellegrino was able to prepare food, do household chores, groom herself, shop, drive, use public transportation, bank, and pay her bills.  (Tr. 944).  He noted that Pellegrino was often anxious and irritable; however, she had no significant impairment in concentration, memory, abstract reasoning, and other cognitive functions.  (Tr. 945).  Dr. Klemperer said that Pellegrino had an adequate ability to remember, understand, and follow directions; maintain attention; sustain concentration; persist at tasks; complete tasks in a timely fashion; and react to pressures in work settings.  (Tr. 946).

On July 30, 2015, Todd Greenberg, M.D., took an MRI of Pellegrino's foot.  (Tr. 1027).  The MRI revealed "mild perineural fibrosis" and nominally diminished muscle bulk; however, her foot condition was otherwise normal and intact.  (Tr. 1027).

In September 2015, Pellegrino saw Ian Rossman, M.D., for an etiological assessment of her chronic pain syndrome.  (Tr. 1210-16).  Dr. Rossman noted that Pellegrino had been

13

prescribed colchicine for presumed Behçet's disease and that she received pain management from Sultan Zaidan, M.D.  (Tr. 1210-11).  Dr. Rossman noted that Pellegrino had had multiple injuries since childhood, and she had reported progressive symptoms, including: (1) constant leg numbness that made walking difficult; (2) severe lumbago; (3) mood/anger outbursts, controlled with counseling and medication; (4) pain everywhere in her body, but worst in her legs; (5) temporomandibular joint dysfunction, for which she wore a brace at night; (6) interrupted sleep due to pain; (7) severe fatigue limiting her daily activities; (8) infrequent incontinence and loose stools; (9) frequent voiding; and (10) left foot pain.  (Tr. 1211).  Notwithstanding her difficulty walking, Pellegrino reported that "she forces herself to walk 3 miles daily, at minimum she walks her dogs around the block daily [, and s]he also admit[ted] to climbing ladders to paint the house, and being able to complete all her [daily living activities]."  (Tr. 1211).  She also said that she had no issues driving and was only a mild risk of falling.  (Tr. 1213).  On examination, Pellegrino was alert and oriented, and she exhibited normal joints, attention, concentration, memory, and intellectual functioning.  (Tr. 1213).  She had full range of motion and normal sensation in her arms and legs.  (Tr. 1214).  She had an antalgic, but otherwise normal, gait. (Tr. 1215).  Dr. Rossman noted that Pellegrino had MRIs in August 2014 and May 2015, which revealed a mild disc bulge in her cervical spine and a previous L5 laminectomy, but no significant abnormalities otherwise.  (Tr. 1215).  Dr. Rossman determined that there were no MRI findings that suggested neuro-Behçet's disease or CNS inflammatory disease and that she was relatively intact on neurological examination.  (Tr. 1215).  Dr. Rossman noted that Pellegrino's myriad pain, fatigue, stress, and mood disorders suggested fibromyalgia, which could be controlled with medication, diet, exercise, and good sleep hygiene.  (Tr. 1216).  Mary Willis, M.D., reviewed Dr. Rossman's notes and concurred in his assessment.  (Tr. 1216).

14

On October 14, 2015, Pellegrino had a spinal x-ray to examine her stenosis.  (Tr. 1097).

The x-ray showed that her vertebral and joint spaces were maintained, and there were no noted

abnormalities or evidence of significant degenerative disc disease or facet joint atropathy.

(Tr. 1097-98).

On December 2, 2015, an MRI of Pellegrino's pelvis showed no fractures, no bone

lesions, and maintained joint spaces.  (Tr. 1096).  There was "mild" disc degeneration and

desiccation at the L4-L5 disc space, but there was no disc herniation or canal or foraminal

stenosis at the L4-L5 or L5-S1 disc space.  (Tr. 1096).

On January 29, 2016, Pellegrino saw Jennifer Muller, M.D., for treatment of her

leukocytosis and fatigue.  (Tr. 1180).  Dr. Muller noted that Pellegrino was considered to have

possible Behçet's disease, but she had not met criteria for it.  (Tr. 1180).  Pellegrino complained

that she had pain in her legs.  (Tr. 1180).  On examination, Dr. Muller noted that there was no

edema or ulcers in Pellegrino's extremities, and she was alert and oriented.  (Tr. 1182).

Dr. Muller recommended that Pellegrino follow up with her primary care physician and pain

management specialist for treatment of her leg pain.  (Tr. 1182).  Dr. Muller recommended that

Pellegrino use iron supplements twice per day to treat her fatigue.  (Tr. 1182).  At a follow-up on

March 18, 2016, Dr. Muller noted that Pellegrino "remain[ed] quite tired," but had a "bit more

energy."  (Tr. 1177).  Dr. Muller also noted that Pellegrino "struggle[d] with pain from disc

disease in her back[,] fibromyalgia[,] and nerve damage.  (Tr. 1177).  On June 17, 2016,

Dr. Muller noted that Pellegrino tolerated her iron supplements without difficulty and that

Pellegrino said she was not sure if she was going to pursue therapy as recommended by

Dr. Ignat.  (Tr. 1174).

On February 16, 2016, Pellegrino saw Mariam Stevens, M.D., for treatment of her PCOS.

(Tr. 1423-26).  Pellegrino told Dr. Stevens that her legs were always numb and burning, and she

15

had frequent urination. (Tr. 1424). Dr. Stevens noted that Pellegrino's cholesterol and blood sugar were uncontrolled, but her blood pressure was well controlled. (Tr. 1426-27).

On February 24, 2016, Daniel Nattell, M.D., took an MRI of Pellegrino's spine. (Tr. 1191). Dr. Nattell found a mild disc bulge in the L4-L5 level, but there was no focal disc herniation or spinal stenosis. (Tr. 1191-92). He also found degenerative signal in the L5-S1 level, again without disc herniation or spinal stenosis. (Tr. 1191-92).

On May 5, 2016, Pellegrino saw John Andrefsky, M.D., for treatment of her unsteady gait, neurological condition, and chronic back and leg pain. (Tr. 1166-72, 1339). Pellegrino said that she'd had difficulty walking since 2000 and that she felt dizzy and unsteady when walking. (Tr. 1166, 1339). Pellegrino said that she had difficulty rising from a chair and going up or down stairs and that she fell in 2008. (Tr. 1166, 1339). On examination, Dr. Andrefsky noted that Pellegrino had muscle weakness, limb pain, and difficulty walking; however, her gait was normal without ataxia, shuffling, steppage, or waddling. (Tr. 1167, 1170, 1340, 1343). Dr. Andrefsky recommended that Pellegrino lose weight and sleep 8 hours each night. (Tr. 1172, 1345).

On September 30, 2016, Pellegrino saw Neera Gupta, M.D., for a psychiatric evaluation. (Tr. 1287-90). Dr. Gupta noted that Pellegrino had been using Paxil for 15 to 20 years and that Pellegrino believed it was no longer effective. (Tr. 1287). Pellegrino also told Dr. Gupta that she got worse with increased levels of Paxil and with Zoloft, which she said made her manic and hyper. (Tr. 1287). Pellegrino said that she had intense anger outbursts, impulsivity, and rapid mood swings. (Tr. 1287). Dr. Gupta noted that Pellegrino also had connective tissue disease and a history of gait disturbance, which had improved with medication. (Tr. 1287). On examination, Dr. Gupta noted that Pellegrino had a normal gait, she was alert and oriented, and her memory

and thought processes were intact.  (Tr. 1289).  Dr. Gupta diagnosed Pellegrino with bipolar II disorder, decreased her Paxil dosage, and added a prescription for Rexalti.  (Tr. 1290).

On November 17, 2016, Pellegrino saw hematologist Wenhui Zhu, M.D., for treatment of her chronic leukocytosis.  (Tr. 1303, 1450).  Dr. Zhu noted that Pellegrino was diagnosed with leukocytosis in 2002 and that she had "multiple vague complaints," including fatigue, fever, night sweats, weakness, sore mouth, throat cough, wheezing, nausea, hand tremors, numbness, tingling, difficulty balancing and walking, itching, tenderness, joint swelling and stiffness, and depression/anxiety.  (Tr. 1303, 1450).  Pellegrino rated her pain as a 6/10 and said that it was controlled through medications.  (Tr. 1304, 1451).  Dr. Zhu did not note any abnormalities on examination, determined that her leukocytosis was most likely inflammatory/reactive, and determined that there was no concern of myeloproliferative disease.  (Tr. 1306, 1453).  Dr. Zhu recommended that Pellegrino do regular exercise/physical activity and try to lose weight. (Tr. 1306, 1453).

### C.     Relevant Opinion Evidence

#### 1.     Treating Source Opinion—Gheorghe Ignat, M.D.

On September 30, 2012, Dr. Ignat completed a medical source statement, indicating that Pellegrino could occasionally lift up to 5 pounds and frequently lift up to 15 pounds.  (Tr. 1031). He indicated that Pellegrino had a standing/walking impairment but did not indicate the extent of that impairment.  (Tr. 1031).  He said that Pellegrino could sit for a total of 2 hours.  (Tr. 1031). He said that Pellegrino could: (1) rarely climb, balance, stoop, crouch, kneel, crawl, reach, push, or pull; and (2) occasionally perform fine and gross manipulation.  (Tr. 1031-32).  She was limited from heights, moving machinery, and pulmonary irritants, and she had been prescribed a brace and a TENS unit.  (Tr. 1032).  Dr. Ignat did not indicate whether Pellegrino was prescribed a cane or walker but said that she had severe pain and needed to be able to alternate positions.

(Tr. 1032).  Dr. Ignat said that Pellegrino's pain would interfere with her concentration and ability to stay on-task, cause absenteeism, and would require that she take additional unscheduled rest breaks beyond those normally provided.  (Tr. 1032).

Dr. Ignat completed a second medical source statement on January 8, 2016.  (Tr. 1069-70).  Dr. Ignat indicated that Pellegrino could occasionally lift up to 15 pounds, stand/walk for a total of 30 minutes and 15 minutes without interruption, and sit for a total of 5 hours and one hour without interruption.  (Tr. 1069).  He indicated that Pellegrino could: (1) rarely climb, balance, stoop, crouch, kneel, crawl, reach, or perform gross manipulation; and (2) occasionally push, pull, or perform fine manipulation.  (Tr. 1069-70).  Dr. Ignat said that Pellegrino was restricted from heights and moving machinery and that she had been prescribed a cane.  (Tr. 1070).  He said that Pellegrino had moderate pain, which would affect her concentration, ability to stay on-task, absenteeism, and need for additional breaks every two hours.  (Tr. 1070).  Dr. Ignat also indicated that Pellegrino would have to elevate her legs at 45 degrees.  (Tr. 1070).

Dr. Ignat completed a third medical source statement on December 7, 2016.  (Tr. 1317-18).  Dr. Ignat said that Pellegrino could lift up to 20 pounds occasionally and 10 pounds frequently.  (Tr. 1317).  She could stand/walk for a total of 2 hours and 30 minutes without interruption, and she did not have a sitting limitation.  (Tr. 1317).  He said that Pellegrino could: (1) occasionally climb, balance, stoop, crouch, kneel, crawl, reach, push, or pull; and (2) frequently perform fine or gross manipulation.  (Tr. 1317-18).  He indicated that Pellegrino was prescribed a cane and a TENS unit, and that she would need to be able to alternate positions between sitting, standing, and walking.  (Tr. 1318).  He said that she had moderate pain, which would impact her ability to concentrate, stay on-task, maintain attendance without absenteeism, and work without more than 2 hours without unscheduled, nonstandard breaks.  (Tr. 1318).  He also indicated that Pellegrino would not need to raise her legs.  (Tr. 1318).

### 2.    Treating Source Opinion—Visar Duane, OTR/L

On October 29, 2014, Pellegrino saw occupational therapist Visar Duane, OTR/L, for a functional capacity evaluation.  (Tr. 973, 1323).  Duane determined that Pellegrino could "function at least at levels identified in the Sedentary work demand level," and her "main limiting factor is the perception of pain with any activity requiring raising her arm."  (Tr. 973, 1323).  Duane stated that Pellegrino could lift up to 12 pounds occasionally and 10 pounds frequently; she could pull 42 pounds occasionally; she and she could sit, stand, and walk constantly with the ability to change position at will.  (Tr. 973, 982, 990, 1323).  Duane stated that, due to "over-guarding" and "less than full participation," Pellegrino might not have represented her full capacity.  (Tr. 973, 1323).  Duane said that Pellegrino could occasionally climb stairs with a handrail, and she could frequently sit, stand, walk, reach overhead, and reach forward.  (Tr. 974).  She walked with a limp.  (Tr. 974).

### 3.    State Agency Consultants

On August 8, 2015, state agency consultant Rannie Amiri, M.D.[3], evaluated Pellegrino's physical capacity based on a review of her medical records.  (Tr. 129-31, 134).  Dr. Amiri determined that Pellegrino could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for up to 6 hours in an 8-hour workday; sit for up to 6 hours in an 8-hour workday; and push/pull without limitation.  (Tr. 129).  She determined that Pellegrino could frequently climb ramps/stairs, stoop, kneel, and crouch; she could occasionally crawl; and she could never climb ladders/ropes/scaffolds.  (Tr. 130).  She was limited in lifting overhead with her left arm, but was otherwise unlimited in handling, fingering, and feeling.  (Tr. 130).  She was also

---

[3] The ALJ, in his decision, and the parties, in their briefs, refer to Dr. Amiri as "Dr. Amari."  *See generally* (Tr. 34); ECF Doc. 11; ECF Doc. 12.  This R&R refers to the individual as "Dr. Amiri" because that is her name.  *See* (Tr. 131, 134).

required to avoid exposure to hazards, including machinery and heights.  (Tr. 131).  Based on her

assessment, Dr. Amiri determined that Pellegrino could perform light work.  (Tr. 134).

On June 18, 2015, state agency consultant Karla Voyten, Ph.D., assessed Pellegrino's

mental capacity based on a review of her medical records.  (Tr. 112, 116-17).  Dr. Voyten

determined that Pellegrino did not have any limitations in understanding, memory, sustained

concentration, and persistence.  (Tr. 116).  On September 1, 2015, Joseph Edwards, Ph.D.,

concurred with Dr. Voyten's opinion.  (Tr. 132).

### D.    Relevant Testimonial Evidence

Pellegrino testified at the ALJ hearing.  (Tr. 52-84).  Pellegrino said that a physician

prescribed her a cane because she could not walk "really long" or balance without it.  (Tr. 56, 65,

69).  She said that she could walk for 15 minutes or less before she had to stop for a break.

(Tr. 58).  Pellegrino said that she had difficulty climbing stairs in her house, but she had to do it

because her bedroom was on her second floor.  (Tr. 65-66).  Pellegrino also had difficulty

reaching, grabbing, cutting hair, opening jars, and holding things due to her shoulder problems.

(Tr. 58).  She could only lift her hands above her head for a minute before they began to hurt.

(Tr. 59, 81).  She could lift a cup of coffee to her lips, but she generally could not zip her jacket

zipper or button buttons.  (Tr. 84).  Pellegrino said that she could do dishes and laundry, but she

only did those when she "fe[lt] like doing it."  (Tr. 82).  Pellegrino said that she had difficulty

standing for prolonged periods due to her chronic fatigue and that she'd had to go to her car to

lay down during her lunch breaks at her last job.  (Tr. 64).  Pellegrino said that she did not have

any difficulties reading and writing and that she got her cosmetology license in her 30s.  (Tr. 53).

She had a valid driver's license, and she drove whenever she needed to.  (Tr. 53).

Pellegrino testified that she had pain all over her body, primarily in her back and left arm,

which she rated as a 9/10 most days.  (Tr. 62, 67-68).  She also testified that she had Behçet's

disease, which had caused issues with her vision, gave her fevers, and caused chronic pain.

(Tr. 55).  She said that she had pain and numbness in her foot, left leg, and back.  (Tr. 56).

Pellegrino was on chemotherapy for her Behçet's disease.  (Tr. 56).  She also took Paxil,

Lorazepam, and Ativan for her chronic anxiety, PTSD, depression, and manic depression.

(Tr. 60).  She said that she had surgery on her back, went to pain management, received steroid

shots, and tried physical therapy.  (Tr. 61, 68).  After her first back surgery (to remove a tumor),

her back pain and numbness increased.  (Tr. 70).  The pain and numbness radiated down into her

right leg.  (Tr. 71).  She said that Dr. Ignat told her that physical therapy would not work due to

her autoimmune disease.  (Tr. 61).  Pellegrino said that her medications helped her pain a "little

bit," but not enough.  (Tr. 62).  She also wore orthotics in her shoes and used a TENS unit;

however, her TENS unit sometimes "hurt [her] nerves."  (Tr. 63-64).  Pellegrino also testified

that she had asthma all her life and was prescribed an inhaler, but she continued to smoke three

cigarettes per day.  (Tr. 80).

Robert Mosely, Ph.D., a vocational expert ("VE"), also testified at the ALJ hearing.

(Tr. 84-99).  The ALJ asked the VE whether a hypothetical individual with Pellegrino's

experience could perform work, if she could perform light work, except:

> she can never climb ladders, ropes, or scaffolds, she can occasionally climb ramps
> or stairs, balance, stoop, kneel, crouch, and crawl.  She's limited to occasional
> overhead reaching, bilaterally.  And she should avoid all exposure to hazards,
> such as dangerous machinery, unprotected heights, and commercial driving.  The
> individual is further limited to routine tasks with no strict time demands, no strict
> production quotas, and no more than minimal or infrequent changes in the work
> setting. . . . [and] no direct work related to interaction with the public, occasional
> interaction with supervisors, and occasional and superficial interaction with
> co-workers.

(Tr. 92-95).  The VE testified that such an individual could not perform Pellegrino's past work,

but could work as an inspector and hand packager, assembler of plastic hospital products, and

assembler of electrical accessories.  (Tr. 95).  The ALJ asked if the hypothetical individual from

the first question could work if she were to "be afforded the opportunity to alternate positions between standing and sitting in approximately 30-minute intervals." (Tr. 96). The VE testified that the same positions would be available to such an individual. (Tr. 96). The ALJ asked if the hypothetical individual from the first question could work if she were limited to sedentary work. (Tr. 96). The VE said that such an individual could work as a touchup screener, final assembler, or lens inserter. (Tr. 96-97).

Pellegrino's counsel asked the VE if any of the jobs available at the sedentary level would be affected by requiring Pellegrino to use a cane for balance and ambulation. (Tr. 97-98). The VE said that the same jobs would be available; however, the jobs he identified at the light level would not be available. (Tr. 98, 100). The VE also said that there were jobs available at the light level for which balance and walking were not an issue, and those could be performed sitting or standing. (Tr. 100-01). Pellegrino's attorney then asked whether a person could work if they were limited to a total of standing for one hour in a workday and sitting for four hours in a workday. (Tr. 98). The VE said that such an individual could not work on a full-time basis. (Tr. 98). The VE also said that, if an individual required 10-minute break every two hours, the individual would not be able to work if that amounted to a total of 15% or more off-task time. (Tr. 98-99). Further, the VE said that a hypothetical individual could not work if she were absent one day a week due to physical impairments. (Tr. 99).

## IV.    The ALJ's Decision

The ALJ's May 2, 2018, decision found that Pellegrino was not disabled and denied her application for DIB. (Tr. 15-37). The ALJ found that Pellegrino had not been engaged in substantial gainful activity since October 5, 2012, and that she had the severe impairments of: "undifferentiated connective tissue disease; lumbar degenerative disc disease and radiculopathy; status post remote L4-S1 laminectomy; bilateral shoulder degenerative joint disease; status post

22

arthroscopic surgeries; obesity; mood disorder; and anxiety-related disorder." (Tr. 17-18). The ALJ also determined that Pellegrino had no impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 22-29). The ALJ determined that Pellegrino had the RFC to perform light work, except that:

> She should be afforded the opportunity to briefly alternate positions between standing and sitting at approximately 30-minute intervals. She can never climb ladders, ropes, or scaffolds. She can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. She is limited to occasional overhead reaching bilaterally. She should avoid all exposure to hazards, such as dangerous machinery, unprotected heights, and commercial driving. The claimant is further limited to routine tasks with no strict time demands, no strict production quotas, and no more than minimal or infrequent changes in the work setting. She is limited to no direct work-related interaction with the public, occasional interaction with supervisors, and occasional and superficial interaction with coworkers.

(Tr. 30). In assessing Pellegrino's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the "objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p." (Tr. 30).

In evaluating Pellegrino's statements that her chronic back pain affected her gait/walking ability and caused her to limp, the ALJ noted that "there [were] indications in the record that [Pellegrino] used a cane." (Tr. 25). Nevertheless, the ALJ noted that "none of [Pellegrino's] treating physicians had clinically observed and documented her using a cane or ambulatory device." (Tr. 25). Further, the ALJ noted that Pellegrino had testified that she attempted to walk three miles per day and, at the least, walked around the block with her dogs daily. (Tr. 25, 32). The ALJ also noted that Pellegrino told Dr. Stearns that she performed home exercises and testified at the hearing that she was "always moving around," remained generally independent in her daily living activities, and "perform[ed] routine and extraordinary household chores (e.g., climbing ladders to paint her house)." (Tr. 31-32).

23

In evaluating the medical opinion evidence, the ALJ stated that he gave "limited weight" to Dr. Ignat's September 2012 treating source opinion because it was "too vague, at times incomplete, and not consistent with his own treatment notes and those treatment notes from [Pellegrino's] other treating physicians."  (Tr. 33).  The ALJ stated that he gave greater, but still limited, weight to Dr. Ignat's December 2016 opinion "to the extent that his opinion that [Pellegrino's] physical functioning is restricted to a reduced range of light work establishes improvements in [Pellegrino's] physical health and [RFC] over the years between 2012 and 2016."  (Tr. 33); *see also* (Tr. 25).  Further, the ALJ stated that Pellegrino's "lack of any chronic daily pain medications during much of the current adjudication period bolster[ed] Dr. Ignat's opinion that [Pellegrino's] physical condition [had] improved since he began treating her in 2012."  (Tr. 33).  The ALJ did not specifically mention Dr. Ignat's opinions that Pellegrino's pain would interfere with her concentration, take her off task, and cause absenteeism.  *See* (Tr. 25, 33).  Instead, the ALJ merely stated that "the evidence fail[ed] to establish any documented physical medical reasons for sustainability in a customary work environment" and that:

> Although Dr. Ignat is not an acceptable mental health practitioner, the undersigned gives limited weight to his opinion that [Pellegrino] has occasional mental abilities in the broad areas of mental functioning to the extent that this opinion bolsters the chronic effects of [Pellegrino's] subtherapeutic and/or inconsistent receipt of mental health treatment modalities due to various reasons unrelated to her mental impairments.

(Tr. 33).

The ALJ said that he gave "considerable weight" to Dr. Amiri's opinion, "to the extent that [her] opinion that [Pellegrino] retained the capacity to lift, carry, push, and pull at light exertional capacity [was] generally consistent with [Pellegrino's] significant[] improve[ment] without the need for daily chronic pain medications for bilateral shoulder impairments."  (Tr. 34).  But the ALJ also said that he found Pellegrino's back pain caused more restrictive

24

limitations than Dr. Amiri had opined, and he "imposed an additional alternating sit/stand option that would not otherwise disrupt her work efficiency." (Tr. 34).

The ALJ found that Pellegrino could not perform any of her past relevant work. (Tr. 34-35). Based on the VE's testimony, however, the ALJ found that Pellegrino was able to perform the requirements of representative occupations such as an inspector/hand packager, assembler of plastic hospital products, and assembler of electronic accessories. (Tr. 36). In light of his findings, the ALJ determined that Pellegrino was not disabled from October 5, 2012, thorough the date of his decision and denied Pellegrino's application for DIB. (Tr. 37).

## V.      Law & Analysis

### A.      Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. § 405(g); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the

25

record.").  This is so because the Commissioner enjoys a "zone of choice" within which to

decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th

Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the

Commissioner's decision when the Commissioner failed to apply proper legal standards, unless

the error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A]

decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when]

that error prejudices a claimant on the merits or deprives the claimant of a substantial right.");

*Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we

review decisions of administrative agencies for harmless error.").  Furthermore, the court will not

uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical

bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.

Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v.

Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant

evidence is not mentioned, the court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio

Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn.

July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D.

Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will

understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial

gainful activity; (2) if not, whether the claimant has a severe impairment or combination of

impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals

any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant

can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the

claimant's age, education, and work experience, she can perform other work found in the

national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d

640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence

at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that

she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.    Medical Opinion

Pellegrino argues that the ALJ violated the treating physician rule when he improperly

failed to give Dr. Ignat's opinion controlling weight and improperly gave greater weight to

Dr. Amiri's opinion.  ECF Doc. 11 at 13-20.  Pellegrino asserts that the ALJ's reasons for giving

Dr. Ignat's opinion "limited weight" were not "good reasons" as required under the regulations.

ECF Doc. 11 at 14.  Specifically, Pellegrino contends that: (1) Dr. Ignat's finding that she had an

improved ability to lift between 2012 and 2016 was not a good reason for rejecting Dr. Ignat's

opinion that her chronic pain and fatigue would cause absenteeism, off-task behavior, and a need

for extra breaks because the two findings were not relevant to each other; and (2) her lack of

daily pain medication was not a good reason for rejecting Dr. Ignat's opinions regarding the

effects of her pain, because her temporary lack of pain medications was due to inefficacy and

adverse side effects, and not a lack of severe pain.  ECF Doc. 11 at 14-17.  Further, Pellegrino

asserts that the ALJ erred in giving Dr. Amiri's opinion greater weight than Dr. Ignat's opinion

because: (1) Dr. Amiri's opinion regarding her RFC was inconsistent with other evidence in the

record; (2) Dr. Amiri had only conducted a one-time evaluation of medical records, and had no

treatment-relationship with Pellegrino; and (3) Dr. Amiri was not a rheumatology specialist,

whereas Dr. Ignat was.  ECF Doc. 11 at 18-20.

The Commissioner responds that the ALJ applied proper legal procedures and reached a conclusion supported by substantial evidence in weighing Dr. Ignat's and Dr. Amiri's opinions. ECF Doc. 12 at 11-22. The Commissioner asserts that the ALJ adequately explained that he gave Dr. Ignat's opinions limited weight because they were vague, inconsistent with his own treatment notes, and inconsistent with other evidence in the record. ECF Doc. 12 at 14-21. The Commissioner also contends that substantial evidence – including Dr. Ignat's findings that Pellegrino's condition had improved between 2015 and 2016, his lack of citations to treatment notes supporting his opinions, and inconsistent opinions reflected in the notes by Dr. Hopkins, Dr. Halpert, Dr. Peechakara, Dr. Zhu, Dr. Bohl, Dr. Stearns, and Dr. Willis – supported the ALJ's reasons for giving Dr. Ignat's opinions limited weight. ECF Doc. 12 at 15-21. Further, the Commissioner argues that Dr. Ignat's opinions regarding whether Pellegrino would have absences, off-task behavior, and a need for breaks that reached a work-preclusive level involved issues reserved for the Commissioner; and the ALJ was not permitted to defer to those parts of Dr. Ignat's opinions. ECF Doc. 12 at 21. Finally, the Commissioner asserts that substantial evidence supported the ALJ's decision to give greater weight to Dr. Amiri's opinion because Dr. Amiri had considered a greater scope of Pellegrino's medical records and her opinion was consistent with other evidence, including evidence that was not part of the record when Dr. Amiri issued his opinion. ECF Doc. 12 at 12-14.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. § 404.1527(c). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is

not inconsistent with the other substantial evidence in [the] case record.'"  *Id.*  (quoting 20 C.F.R. § 404.1527(c)(2)).  Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. § 404.1527(c).  Inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion.  *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)-(6).  Nothing in the regulations requires the ALJ to explain how he considered each of the factors.  *See* 20 C.F.R. § 404.1527(c).  Nevertheless, the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight."  *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned.").  When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939.

"[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376. Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion. *Id.*; 20 C.F.R. § 404.1527(c). An ALJ may rely on a state agency consultant's opinion and may give it greater weight than other opinions if it is supported by the evidence. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015). Further, an ALJ may rely on a state agency consultant's opinion that predates other medical evidence in the record, if the ALJ takes into account any evidence that the consultant did not consider. *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009).

On one hand, the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in evaluating Dr. Amiri's opinion. 42 U.S.C. § 405(g); *Elam*, 348 F.3d at 125. The ALJ complied with the regulations when he explained that he gave Dr. Amiri's opinion "considerable weight" because it was generally consistent with other records, except to the extent that records reflected greater restrictions due to back pain. 20 C.F.R. § 404.1527(c); *Gayheart*, 710 F.3d at 376-77; (Tr. 34). The ALJ was not precluded from giving Dr. Amiri's opinion considerable weight, notwithstanding the ALJ's rejection of Dr. Ignat's opinion, because the ALJ found her opinion to be consistent with other evidence in the record, and the ALJ also considered evidence that was not in the record at the time Dr. Amiri issued her opinion. *Reeves*, 618 F. App'x at 274; *McGrew*, 343 F. App'x at 32; (Tr. 15-37). Furthermore, evidence in the record supported the ALJ's conclusion that Dr. Amiri's opinion was consistent with other evidence in the record, including: (1) notes indicating that medications, steroid injections, physical therapy, exercise, and diet could or did help her improve; (2) notes from Dr. Gupta,

30

Dr. Rossman, Dr. Klemperer, and Toomey indicating that she was able to maintain alertness, orientation, concentration, attention, memory, persistence, and task-completion; (3) Dr. Stearns' notes indicating that Pellegrino was able to return to work, regained full motion after her surgery, and was able to exercise on her own, even though she was not diligent about going to physical therapy; and (4) Duane's findings that she could work at the sedentary level, lift up to 10 pounds frequently, pull 42 pounds occasionally, and frequently sit, stand, and walk. (Tr. 343, 350-51, 353, 375-403, 418, 460, 468, 480, 501-02, 505, 531, 757-58, 763-64, 766, 944-46, 973-74, 982, 990, 1073-77, 1080-82, 1107, 1111-12, 1117, 1121, 1129, 1136, 1138, 1142, 1163-65, 1172, 1213-16, 1233, 1287, 1289, 1295-99, 1301-02, 1304, 1313, 1323, 1345, 1350-51, 1451, 1459, 1461-62, 1500-10). Because substantial evidence supported the ALJ's reasons for giving Dr. Amiri's opinion "considerable weight," the ALJ's decision fell within the Commissioner's "zone of choice." *Mullen*, 800 F.2d at 545.

On the other hand, the ALJ failed to apply proper legal standards in evaluating Dr. Ignat's opinions. 42 U.S.C. § 405(g); *Elam*, 348 F.3d at 125. Initially, the ALJ complied with the regulations when he said that he gave Dr. Ignat's opinions regarding Pellegrino's lifting restrictions and standing/walking/sitting restrictions "limited weight" because they were vague, incomplete, and inconsistent with his own and other providers' treatment notes. 20 C.F.R. § 404.1527(c); *Gayheart*, 710 F.3d at 376-77; (Tr. 25, 33). However, the ALJ never addressed Dr. Ignat's opinions that Pellegrino's pain would affect her absenteeism, ability to stay on task, and need for nonstandard breaks. (Tr. 33). Although the ALJ said that "the evidence fail[ed] to establish any documented physical medical reasons for sustainability in a customary work environment," a common-sense reading of the ALJ's opinion as a whole does not suggest that the ALJ was referring to the effects of Pellegrino's pain on her ability to go to work regularly and stay on task. *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; *see also Buckhanon ex rel.*

31

*J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense."); (Tr. 33).  Instead, it appears that the ALJ addressed only Pellegrino's stress, anxiety, and breathing problems when he referred to Pellegrino's "sustainability."  (Tr. 33).  Further, although the ALJ acknowledged that Pellegrino did not take daily pain medications, he did so only with respect to his finding that Dr. Ignat's opinion indicated that Pellegrino had improved – not with respect to Dr. Ignat's opinion that Pellegrino's pain caused absenteeism and off-task behavior.  (Tr. 33).  Because the ALJ failed to address Dr. Ignat's opinion regarding the effects of Pellegrino's pain, it cannot be said that the ALJ provided "good reasons" for rejecting that opinion or gave a "sufficiently specific" explanation for doing so.  *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938.

The ALJ's failure to consider Dr. Ignat's opinion regarding the effects of Pellegrino's pain on her absenteeism and off-task behavior was not harmless error, as the Commissioner argues.  Even if those opinions implicated issues reserved for the commissioner, the ALJ was not permitted to simply ignore them.  *See* SSR 96-5p, 1996 SSR LEXIS 2 (July 2, 1996), *rescinded by* 82 Fed. Reg. 15263 (Mar. 27, 2017) (effective for claims filed on or after March 27, 2017) (opinions on issues reserved for the Commissioner should be evaluated in the same manner as opinions from non-treating sources).  Moreover, because the VE later testified that the levels of absenteeism and off-task behavior identified in Dr. Ignat's opinion would preclude work at all exertional levels, a finding that Dr. Ignat's opinions regarding absenteeism and off-task behavior were due more-than-limited weight could have resulted in a finding that Pellegrino was disabled.  (Tr. 98-99).

The ALJ's failure to follow proper legal standards in evaluating Dr. Ignat's opinion resulted in a failure to build an accurate and logical bridge between the evidence and the denial of Pellegrino's application for DIB.  *Fleischer*, 774 F. Supp. 2d at 877.  Accordingly, I

recommend that the Court vacate the ALJ's decision denying Pellegrino's application for DIB and remand the case for further consideration of Dr. Ignat's treating source opinions.

### C.    RFC Assessment

Pellegrino argues that the ALJ erred by failing to integrate her use of a cane into her RFC, and by failing to explain adequately his reasons for omitting that limitation.  ECF Doc. 11 at 21.  She asserts that the record shows that she had a long history of using assistive devices for walking and that her use of assistive devices was medically necessary due to her pain, weakness, fatigue, and difficulty balancing.  ECF Doc. 11 at 21.  Pellegrino asserts that the ALJ's failure to include this limitation was not harmless error because the VE testified that requiring a cane would preclude "light" work.  ECF Doc. 11 at 21.

The Commissioner responds that SSR 96-9p precluded the ALJ from finding that Pellegrino required a cane or other hand-held assistive device, because none of the medical records or opinions established that an assistive device was medically necessary.  ECF Doc. 12 at 22.  Further, the Commissioner asserts that substantial evidence supported the ALJ's decision not to include a use-of-a-cane limitation in Pellegrino's RFC, including numerous examination findings that she had a normal gait, full strength in her lower extremities, and unremarkable diagnostic imaging.  ECF Doc. 12 at 23.  The ALJ also asserts that Pellegrino's lack of chronic pain medication, decision to decline trigger point injections, decision not to avail herself of aquatic therapy, and statements that she attempted to walk up to three miles per day were inconsistent with her claims that she required a cane.  ECF Doc. 12 at 23-24.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p,

SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and

restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"

SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history,

medical signs, laboratory findings, and statements about how the symptoms affect the claimant.

20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.  Further, SSR 96-9p provides

that:

> [t]o find that a hand-held assistive device is medically required, there must be
> medical documentation establishing the need for a hand-held assistive device to
> aid in walking or standing, and describing the circumstances for which it is
> needed (i.e., whether all the time, periodically, or only in certain situations;
> distance and terrain; and any other relevant information).

SSR 96-9p, 1996 SSR LEXIS 6 (July 2, 1996).

The ALJ applied proper legal procedures in omitting from his RFC finding a limitation

requiring Pellegrino to use a cane.  42 U.S.C. § 405(g); *Elam*, 348 F.3d at 125.  Here, the ALJ

complied with the regulations by considering all of Pellegrino's impairments and symptoms –

including Pellegrino's use of a cane – in light of the medical and other evidence in the record.  20

C.F.R. § 404.1520(e); SSR 96-8p, 1996 SSR LEXIS 5; (Tr. 22-33).  The ALJ adequately

explained that, although the record showed that Pellegrino used a cane, her claims that she

required a cane to walk were inconsistent with: (1) the lack of any clinical observation of

documentation that she used a cane or ambulatory device; and (2) Pellegrino's own statements to

Dr. Stearns' notes that she performed home exercises, was always moving around, remained

generally independent in her daily living activities, and performed both routine and extraordinary

household chores (including climbing ladders to paint her house).  (Tr. 25, 31-32).

Substantial evidence, however, does not support the ALJ's reasons for omitting a use-of-a-

cane limitation from Pellegrino's RFC.  42 U.S.C. § 405(g); *Elam*, 348 F.3d at 125.  First,

substantial evidence does not support the ALJ's conclusion that the record lacked clinical

observations supporting Pellegrino's cane use. To the contrary, Dr. Hopkins observed at a treatment session that Pellegrino walked with a cane, and Dr. Ignat observed at a treatment session that Pellegrino could not walk without a walker. (Tr. 1071, 1349). Further, Dr. Ignat issued two medical opinions indicating that Pellegrino was prescribed a cane. (Tr. 1318). For the same reasons, the Commissioner's post-hoc argument that SSR 96-9p precluded the ALJ from finding that Pellegrino required a cane is unavailing – medical evidence existed to support her use of a cane. SSR 96-9p, 1996 SSR LEXIS 6; (Tr. 1071, 1318, 1349).

Similarly, substantial evidence does not support ALJ's conclusion that Pellegrino's own statements indicated that she did not need a cane. Although Pellegrino told *Dr. Rossman* (not *Dr. Stearns*) that she tried to walk three miles a day, walked her dogs around the block, and did some home exercises (mostly related to her *shoulders*) she never indicated that she was able to do any of her walking without an assistive device. *See generally* (Tr. 52-82, 1211). Similarly, a review of Pellegrino's testimony and statements does not reveal that she said she was "always moving around," and the ALJ provided no citation for that finding. *See* (Tr. 32). Although Pellegrino's ability to climb a ladder could potentially imply that she had a greater ability to move than her testimony suggested, the ALJ did not explain how climbing ladders (which involves support for both upper and lower extremities) and walking without an ambulatory device (which involves using only lower extremities) were related. (Tr. 25, 31-32). Although other evidence in the record might have supported other reasons for rejecting Pellegrino's cane-use limitation, evidence did not support the reasons the ALJ gave. Accordingly, the ALJ's decision does not build an accurate and logical bridge between the evidence and his conclusion that Pellegrino did not require the use of a cane. *Fleischer*, 774 F. Supp. 2d at 877.

An ALJ's failure to include a use-of-a-cane limitation in the RFC finding is harmless when the plaintiff cannot show that the ultimate determination that there were a significant

number of available jobs would have been different had the ALJ included a use-of-a-cane

limitation.  *See Humphries v. Comm'r of Soc. Sec.*, No. 18-12123, 2019 U.S. Dist. LEXIS

120705 *26 (E.D. Mich., June 25, 2019) ("Since the ultimate determination that there are a

significant number of available jobs that [the claimant] could perform would not change even

with the added cane limitation, any error here is harmless."); *Shinseki v. Sanders*, 556 U.S. 396,

409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party

attacking the agency's determination.").  Indeed, courts throughout the Sixth Circuit have held

that an ALJ's failure to include a use-of-a-cane limitation (which would have precluded light

work) in the RFC was harmless error when the VE's testimony identified several jobs at the

sedentary level that would be available to the claimant had the use-of-a-cane limitation been

integrated into the RFC finding.  *See, e.g., Plezia v. Comm'r of Soc. Sec.*, No. 1:17-cv-1765,

2018 U.S. Dist. LEXIS 109224 *10 (N.D. Ohio, June 14, 2018) ("The ALJ posed a hypothetical

to the VE incorporating sedentary work with the use of a cane for ambulation.  In response, the

VE identified a significant number of jobs in the regional and national economies.  Therefore,

any error with the light work RFC [and the omission of a use-of-a-cane limitation] would be

harmless.") (Baughman, M.J.), *adopted by* 2018 U.S. Dist. LEXIS 109214 (June 29, 2018)

(Pearson, D.J.); *see also Jozlin v. Comm'r of Soc. Sec.*, No. 12-cv-10999, 2013 U.S. Dist. 33582

*26-28 (E.D. Mich., March 12, 2013) ("[E]ven if the ALJ had included Plaintiff's alleged need

to ambulate with a cane in her RFC, as plaintiff indicated, the RFC would have limited her to

sedentary work, and the VE testified that jobs existed in the economy for an individual with such

limitations."); *Wolford*, 2018 U.S. Dist. LEXIS 88166 *36-37; *Lowery v. Comm'r of Soc. Sec.*,

No. 17-12348, 2018 U.S. Dist. LEXIS 102278 *15 n.1 (E.D. Mich., May 29, 2018) ("[E]ven if

the ALJ had erred in failing to incorporate [the claimant's] use of a cane into her RFC findings,

any such error is harmless whe[n] the VE testified that 60,000 sorter jobs could still be

performed by a hypothetical individual with such restrictions."); *but see Trollinger v. Berryhill*, No. 1:17-cv-1358, 2018 U.S. Dist. LEXIS 79118 *38 (N.D. Ohio, Apr. 25, 2018) (omission of cane limitation was not harmless when the VE testified that using a cane would restrict the claimant to sedentary work and result in a finding of disability under the Medical-Vocational Guidelines), *adopted by* 2018 U.S. Dist. LEXIS 79113 (May 10, 2018); *Pahanish v. Comm'r of Soc. Sec.*, No. 3:18-cv-38, 2018 U.S. Dist. LEXIS 221002 *8 (N.D. Ohio, Nov. 13, 2018) (omission of cane limitation not harmless because, although the VE was asked about the use of a cane, a "technical difficulty broke off the continuity of the question" and the Commissioner conceded that the VE understood the question and that there would be no work if a use-of-a-cane limitation were added), *adopted by* 2019 U.S. Dist. LEXIS 20015 (Feb. 7, 2019).

The ALJ's failure to include a use-of-a-cane limitation in the RFC was harmless error. Despite finding that Pellegrino was capable of performing a range of light work and omitting a use-of-a-cane limitation, the ALJ nevertheless asked the VE whether an individual with Pellegrino's characteristics could perform any jobs if she were limited to sedentary work with the same limitations identified in the ALJ's light-work hypothetical.  (Tr. 96).  The VE said that such an individual could work as a touchup screener (100,000 jobs available), final assembler (over 100,000 jobs available), or lens inserter (over 100,000 jobs available).  (Tr. 96-97).  Upon further questioning by Pellegrino's attorney, the VE said that the same jobs would be available at the sedentary level if a use-of-a-cane limitation were added.  (Tr. 97-98, 100).  Although the ALJ did not cite this testimony in finding that Pellegrino could perform work in the national economy, it is nevertheless substantial evidence supporting the ALJ's conclusion.  *See Sothen v. Comm'r of Soc. Sec.*, No. 1:13-cv-2426, 2014 U.S. Dist. LEXIS 158569 *9 (N.D. Ohio, Nov. 10, 2014) ("[W]hen a reviewing court is not addressing a matter requiring an articulation of reasons by the ALJ, it must look at the record as a whole and may look at any evidence in the record, even that

not cited by the ALJ." (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001)). Because the evidence as a whole indicates that Pellegrino could perform over 300,000 jobs available in the national economy, even if she were limited to sedentary work and required a cane for balance and ambulation, Pellegrino cannot show that the ALJ's ultimate determination would have been different had those limitations been incorporated into the RFC finding. *Humphries*, 2019 U.S. Dist. LEXIS 120705 *26; *Shinseki*, 556 U.S. at 409; *see also Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902 (6th Cir. 2016) (holding that 6,000 jobs "fits comfortably" within what courts have found significant). Thus, the ALJ's failure to include a use-of-a-cane limitation in Pellegrino's RFC was harmless. In light of these findings, I would normally recommend that the Court affirm the ALJ's Step Four and Step Five conclusions. Nevertheless, the ALJ could determine, upon remand, that additional limitations must be incorporated into Pellegrino's RFC upon proper consideration of Dr. Ignat's opinion. Because the ALJ did not incorporate into his hypothetical question to the VE a limitation for absenteeism or off-task behavior, additional VE testimony may be necessary upon remand. Further, the ALJ should take advantage of the remand to correct his error in omitting a use-of-a-cane limitation from Pellegrino's RFC – even though that error up to this stage was harmless.

## VI.     Recommendation

Because the ALJ failed to apply proper legal standards in evaluating Dr. Ignat's opinion, I recommend that the Commissioner's final decision denying Pellegrino's application for disability insurance benefits be VACATED and that Pellegrino's case be REMANDED for further consideration.

Dated: October 22, 2019

Thomas M. Parker
United States Magistrate Judge

_____

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).